**In the Matter of the EXTRADITION OF Yechiel HEILBRONN, a/k/a Yechiel Ben–Zui Helbronn a/k/a Yechiel Hailey a Fugitive from the State of Israel.**

**No. 1:91:M:10.**

United States District Court,
W.D. Michigan.

May 9, 1991.

See also 773 F.Supp. 1576.

Thomas J. Gezon, Acting U.S. Atty., Donald A. Davis, Asst. U.S. Atty., Chief, Crim. Div., Grand Rapids, Mich., Drew C. Arena, Director, Office of Intern. Affairs, Wendy H. Blank, Trial Atty., Office of Intern. Affairs, Dept. of Justice, Washington, D.C., for U.S. Dept. of Justice on behalf of State of Israel.

Nathan Lewin and Douglas F. Curtis, Miller Cassidy Larroca & Lewin, Washington, D.C., David F. DuMouchel, Detroit, Mich., for respondent.

## CERTIFICATION OF EXTRADITABILITY AND ORDER OF COMMITMENT

HUGH W. BRENNEMAN, Jr., United States Magistrate Judge.

This is a proceeding pursuant to 18 U.S.C. § 3184 to certify the extradition of Dr. Yechiel Dov Heilbronn, an Israeli national, to the State of Israel, under the provisions of the Convention on Extradition Between the Government of the United States of America ("the United States") and the Government of the State of Israel ("Israel"), which was signed at Washington, D.C. on December 10, 1962, and entered into force December 5, 1963 ("the Convention"). 14 UST 1707; TIAS 5476.

*Procedural History*

Dr. Heilbronn ("the respondent") was charged in a complaint filed in this district on January 30, 1991, with offenses in violation of the laws of Israel. Based upon this complaint, an arrest warrant was issued for Dr. Heilbronn in this district on January 30, 1991, and the warrant was executed in Petoskey, Michigan, in this district by the United States Marshal's office that evening. Petoskey is located approximately 185 miles north of Grand Rapids.

The complaint related that Dr. Heilbronn had been charged in Israel with having committed the offenses of bribery and fraud under aggravated circumstances, in violation of Sections 290 and 415 of the criminal code of that country, and that a warrant had been issued for the arrest of the doctor on September 6, 1990 by a court in Tel Aviv, Yaffo.

The Extradition Request relates that respondent had previously been arrested in Israel on June 12, 1988, and was released on bail two days later. An indictment was filed in the spring of the following year. During the investigation and pending trial, respondent remained free on bail. Moreover, at his own request, respondent was allowed to leave Israel and come to the United States to attend medical seminars, but on the condition that he return in time for hearings. At the same time respondent's bail was increased 45,000 NIS (New Sheqels). Trial was set for November 28, 1989, but respondent failed to appear. A summons was issued and when respondent still did not appear, the September 6, 1990, arrest warrant was issued.

Following his arrest, Dr. Heilbronn appeared with Grand Rapids counsel before the undersigned on January 31, 1991. All court proceedings have taken place in Grand Rapids, Michigan. A bond hearing was scheduled for Monday, February 4, 1991, at the request of Dr. Heilbronn's local counsel, when the respondent's New York counsel could be present.

A bond hearing was held on February 4, 1991. Dr. Heilbronn was represented by both local and New York counsel. At the conclusion of the hearing, Dr. Heilbronn was remanded to the custody of the U.S. Marshal pending an extradition hearing. The extradition hearing was delayed, with Dr. Heilbronn's concurrence, to February 19, 1991, to accommodate the schedule of Dr. Heilbronn's New York counsel.

In a telephone status conference held February 13, 1991, the extradition hearing was postponed to March 6, 1991, again at the request of the Dr. Heilbronn's New York attorneys and again with his informed consent.

At the time scheduled for the extradition hearing, Dr. Heilbronn appeared with new counsel from Detroit, who requested a further postponement to allow another new counsel from Washington, D.C. to prepare a defense for Dr. Heilbronn. The court was informed that Dr. Heilbronn had become dissatisfied with his New York attor-

neys. This continuance was granted and the extradition was scheduled for and held March 27, 1991.

Dr. Heilbronn appeared at the extradition hearing with his Detroit counsel and his two new attorneys from Washington, D.C. In addition to the extradition documents which were already a matter of record, and to which no objection was taken, the court had the opportunity at the hearing to hear testimony from Dr. Heilbronn and two defense witnesses.

During the hearing the United States moved to introduce into evidence additional affidavits in support of a supplemental memorandum it had filed with the court shortly before the hearing. This memorandum was submitted in response to memorandum of law filed by respondent in opposition to the proposed extradition on Friday, March 22, 1991. The supplemental affidavits were admitted into evidence over an objection for timeliness, and Dr. Heilbronn's lead counsel was granted a twelve day continuance over the Jewish passover to examine and file a response to the new material. An additional day was subsequently granted at respondent's request. Respondent's brief was filed on April 10, 1991.

In addition to the numerous factual and legal arguments raised by respondent on the issue of extradition, he has reopened and raised a number of issues regarding the granting of bail. The question of bail was extensively briefed by both parties in these and several later briefs, and is the subject of a separate opinion.

*Findings of Fact and Conclusions of Law*

After hearing and considering the evidence of criminality offered against the respondent, and the various objections thereto, I deem the evidence sufficient to sustain all but two of the charges brought against Dr. Heilbronn under the Convention. In support of this determination I hereby make and certify the following findings:

FIRST, that the Respondent, Dr. Heilbronn, is the same person sought by Israel in this action. This finding is based on the affidavit of Yosef Fromm and Dr. Heilbronn's photograph contained in the extradition request, and Dr. Heilbronn's admission in open court.

SECOND, that the convention is, and has been at all relevant times, in full force and effect. This finding is based on the uncontroverted affidavit of James E. Baker, Attorney Adviser, Office of the Legal Adviser, United States Department of State, and upon the fact of the publication of the Convention in both The United States Treaties and Other International Proceedings (UST), and Treaties and Other International Acts (TIAS). Inclusion in either of these publications is legal and competent evidence of this treaty in this court. 1 U.S.C. §§ 112a, 113.

THIRD, that this tribunal has personal jurisdiction over the respondent. 18 U.S.C. § 3184; W.D. Mich. R. 1(a)(3); *Ward v. Rutherford*, 921 F.2d 286 (D.C.Cir.1990) *cert. dismissed sub nom. Ward v. Attridge*, —— U.S. ——, 111 S.Ct. 2844, 115 L.Ed.2d 1013 (1991).

FOURTH, that, by way of background, the following facts have been established by competent evidence:

a) that at all times relevant, respondent was the chairman or director of the neuro-surgical department of at the Beilinson Hospital.

b) that as director of the department, respondent had the right to, and did, determine who would operate in the department and who would not, and which operation would be performed. That whenever he was present he could intervene in any operation when he believed it to be necessary.

c) that the amount of elective operating days available to the department each week was limited.

d) that Beilinson Hospital in Potah Tikav is a Kupat Holim Clalit (General Sick Fund) Hospital. The Kupat Holim Clalit is a subsidiary or affiliate of the Histadrut (the General Labor Federation). Over 30% of the acute and general care hospital beds in Israel belong to the Kupat Holim Clalit, which is the largest of the four health/sick funds which provide

health care to the public. All four sick funds derive their funding primarily from membership fees, fees paid by employers, and government funding. Since a hospital such as Beilinson receives government funding under the Israeli (Foundations of Budget Law, 5745–1985), it may not alter the term and conditions of employment of its medical staff without approval of the government or the Minister of Finance. Salaries of the doctors are based upon Ministry of the Treasury negotiated salary scales.

e) that Beilinson Hospital is a teaching hospital.

f) that the Kupat Holim Clalit is the largest sick fund in Israel, and services 3.4 million people (over 75% of the population of Israel). Members of this fund are entitled to receive services directly from this fund, and when hospitalized in a hospital such as Beilinson Hospital, to not have to pay additional sums for medical services.

g) that as a public government-subsidized health agency, the Kupat Holim Clalit received approximately $11,000,000 from the Ministry of Health during the 1989–90 budget year, and $28,500,000 through the first ten months of the 1990–91 budget year. This government funding constitutes, according to the Deputy Director of the Hospital Services Division of the Ministry of Health, "a major part" of Kupat Holim Clalit's budget.

h) Histradrut workers are prohibited under their constitution from receiving any bribe or other direct or indirect benefit from a person that has a relationship to him because of his work in the institution.

FIFTH, that there are criminal charges pending in Israel against the respondent. This finding is based on the Charge Sheet listing charges pending in the Tel Aviv District Court in Criminal Case 165/89, and the Warrant of Arrest signed by Judge Chaim Adar, both contained in the extradition request.

SIXTH, that those specific crimes for which the Israel has indicated that it seeks extradition of the respondent are enumer-

ated as extraditable offenses in the Convention. The Charge Sheet and the Warrant of Arrest charge the respondent with taking a bribe, an offense contrary to Section 290(a) of the Israeli Penal Code, 5737 1977, and Receipt of something by deceit, an offense contrary to Section 414 of the Penal Code. These two offenses are listed as extraditable offenses in paragraphs 15 (bribery) and 14 (Obtaining money ... or goods by false pretenses ...), respectively, of Article II of the convention.

The Charge Sheet lists twelve separate numbered "charges," each relating to a separate patient and incident. Each of the twelve charges allegedly gives rise to several offenses under Israeli law.

Israel does not seek respondent's extradition for any offenses arising out of the "Eleventh Charge," nor for any offenses arising out of the remaining charges other than those listed in the following paragraph, nor for the offense of extortion, a crime with which respondent is also charged and which is listed in the convention.

The offenses for which extradition is sought are eleven alleged incidents of bribery, arising out of charges numbered one through ten and number twelve, and two alleged incidents of Receipt of something by deceit, arising out of Charges eight and nine.

SEVENTH, that the allegations contained in charges 1–10 and 12 of the Charge Sheet, are sufficient in each instance to set forth the offense of bribery, and in charges eight and nine, the offense of receipt of something by deceit.

## I. BRIBERY

Respondent defines bribery as the giving or receiving of anything of value in corrupt payment for an official act done or to be done with the corrupt intent to influence the action of a public official or of any other person professionally concerned with the administration of public affairs. He then argues that the incidents alleged here do not "constitute 'bribery' as understood in the United States." This is purportedly so because 1) bribery, as respondent con-

tends that term is used in the convention, refers only to payments or benefits given to people who are "public officials" and respondent was not a public official, 2) the performance of surgery for which respondent received money was not an official act, and 3) there was no corruption of a regulatory duty. In addition, respondent argues that the requirement of "dual criminality" has not been met. These contentions will be discussed seriatim.

A. *Argument: Respondent is not a public official.*

■ Respondent's first argument rests on the premise that the crime of bribery can extend only to public officials. Despite the strenuous arguments of respondent in support of this proposition, it is simply not the law.

First, the convention itself refers only to "Bribery." It makes *no reference to public officials.*

Second, bribery "as understood in the United States" is not limited only to incidents involving public officials. It encompasses private individuals as well, and has been so understood since prior to the 1962 signing of the convention.

While the crime of bribery evolved at common law from corruption of the public administration of justice [3 COKE INSTITUTES 145 (1648)] to public officials outside the judicial branch [I BURDICK, CRIMES § 288 (1946)], most jurisdictions have now defined bribery by statute. 12 AM JUR 2d Bribery § 3. The crime of bribery may now involve persons other than public officials. *Id.*

The U.S. Supreme Court clearly resolved this issue in *Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). In *Perrin,* the Court specifically addressed this issue in the course of determining what Congress must have understood bribery to mean when it passed the Travel Act in 1961. There, too, a defendant argued

"that Congress intended 'bribery' in the Travel Act to be confined to its common-law definition, *i.e.,* bribery of a public official. He contends that because com-

mercial bribery was not an offense at common law, the indictment fails to charge a federal offense." *Id.* at 41, 100 S.Ct. at 313.

The Court responded:

"In this country, by ... 1961, federal and state statutes had extended the term bribery well beyond its common-law meaning.... Federal statutes specifically using "bribery" in the sense of payments to private persons to influence their actions are the Transportation Act of 1940, 49 U.S.C. § 1(17)(b) (prohibiting the "bribery" of agents or employees of common carriers), and the 1960 Amendments to the Communications Act, 47 U.S.C. § 509(a)(2) (prohibiting the "bribery" of television game show contestants)." *Id.* at 43, 100 S.Ct. at 314–15.

The Court gave further examples of federal statutes making illegal the giving or receiving of payments to influence private duties, which did not actually use the word bribery. These were 18 U.S.C. 215 (bribery of private bank officers); 41 U.S.C. 51 (bribery of contractors to secure subcontracts); and 29 U.S.C. 186 (bribery of labor union officials).

The Court then turned to the states and observed that "[a] similar enlargement of the term beyond its common-law definition manifested itself in the states prior to 1961." *Id.* at 44, 100 S.Ct. at 315. The Court went on to identify 42 states which had outlawed by this time commercial bribery generally and/or bribery in particular fields, including bribery of agents, common carrier and telegraph employees, labor officials, bank employees and athletes. Michigan was one of these states.

The Court concluded:

"In sum, by 1961 the common understanding and meaning of "bribery" had extended beyond its early common-law definitions. In 42 states and in federal legislation, "bribery" included the bribery of individuals acting in a private capacity. (citation omitted)." *Id.* at 45, 100 S.Ct. at 315.

Accordingly, I find no basis for respondent's repeated assertion "that 'bribery,' as

that term is used in the governing treaty, refers *only* to payments made or benefits given to people who are 'public officials'" Respondent's Supplemental Memorandum, April 10, 1991, at 15.

B. Argument: The performance of surgery for which respondent received money was not an official act.

■ In this argument, respondent contends that his neurosurgery was not a duty of an "official character." He argues that "[a]n official act necessarily relates in one way or another, to the exercise of sovereign authority, and the provision of individualized medical attention does not fit this mold."

Taken literally, this argument would mean that only someone authorized to act on behalf of a sovereign could be bribed. But, as discussed previously, this argument is untenable since private as well as public actors may be the target of a bribe.

The essence of the argument, however, appears to be that the receipt of money must be for the purpose of influencing a person to disregard or improperly discharge a duty entrusted to him by his principal, whether that be a government, a private individual or corporation. Respondent contends that, at most, he may be accused of unethical or even illegal moonlighting by performing the surgeries, but nothing more. He appears to contend that performing such a surgery was not an act in the exercise of his office as director of the department, but merely in addition to it.

The charge sheet views the situation differently. In regard to each of the eleven incidents, the charge sheet alleges that respondent "accepted money for an action associated with his position", and that he "misused his authority." Taken together, these constitute the essential elements of bribery and an offense is stated. Whether respondent actually abused the discretion of his office is a question of fact.

C. Argument: There was no corruption of a regulatory decision.

■ Respondent argues that a critical element of bribery is a showing of corrup-

tion. This is a correct statement. Bribery does not apply to the mere *taking* of a reward. The essence of the crime is that it tends to produce corruption in office, and to prevent the proper performance of a duty owed.

"An act is 'corruptly' done if it is done voluntarily and intentionally to bring about either an unlawful result or a lawful result by some unlawful method with a hope or expectation of either financial gain or other benefit to one's self or to another." Manual of Model Jury Instructions for The Ninth Circuit, Instruction No. 3.14 (1989); *See*, Devitt, Blackmar and O'Malley, Federal Jury Practice and Instructions—Criminal, § 26.08.

But respondent goes on to state, incorrectly in my opinion, that "[t]he allegations against Dr. Heilbronn, however, involve the contention that a surgeon received a payment, not for his position or influence, but for his skill." Respondent's Memorandum of Law, filed March 22, 1991, at 22. This may be respondent's characterization of the allegations, but as discussed in the previous argument, the charge sheet clearly asserts that respondent "misused his authority." Thus, the element of corruption is alleged.

Respondent then further argues that the payments "in no way *corrupted* Beilinson Hospital. No official judgment was compromised." These are only questions of fact. As defined above, corruption may be present where a lawful result (e.g., an operation performed by the top surgeon) is obtained by some unlawful method (e.g., the illegal payment of money to compromise the discretion of the departmental director in assigning the surgery to the top surgeon).

D. Argument: Respondent also contends that the "double criminality" test was not met because respondent's alleged conduct was not illegal under federal or Michigan law, as well as Israeli law.

■ The double or dual criminality doctrine requires that the particular act charged be criminal in both jurisdictions. *Collins v. Loisel*, 259 U.S. 309, 42 S.Ct.

469, 66 L.Ed. 956 (1922). Although no dual criminality requirement regarding these offenses is explicitly stated in this particular extradition treaty, the requirement appears nevertheless applicable. *See Demjanjuk v. Petrovsky,* 776 F.2d 571, 579 (6th Cir.1985).

In raising the dual criminality argument, respondent again chooses to characterize his acts as nothing more than demanding fees for services rendered. "In Israel, that may be bribery, but in the United States, it is a free-market transaction." Respondent's memorandum, March 22, 1991, at 25. Respondent reasons that in actuality he has been accused of nothing more than "engaging in the private practice of medicine." *Id.*

Such an argument ignores the thrust of the Israeli contention which is that respondent's election to "moonlight" or "engage in the private practice of medicine" was done in derogation of his responsibility as the director of the department to assign, perform and or monitor surgeries on the basis of medical necessity, or at least free of considerations of private gain to himself. It is the exercise of Dr. Heilbronn's discretion as the director of the department which has been put at issue.[1] This is the reasonable construction of a charge sheet which asserts that the respondent served as the director of the neurosurgery department, that the patients were entitled to free treatment, that treatment was not to be conditioned upon the making of donations or the exertion of influence or pressure, and that the accused nevertheless accepted money for actions associated with his position, "misused his authority," and acted arbitrarily.

It is also significant that throughout the charge sheet the Israelis consider respondent's position to be one of public service. Regardless of whether the State of Israel may give a broader definition to the term public servant than we would in this country, or whether this is a necessary element to a bribery charge (see discussion, *supra*),

the point is implicit that as a public servant, and a departmental director as well, respondent is being held answerable for having a duty to the department and its patients which transcended personal pecuniary considerations.

In sum, the offenses alleged consist of not only the act of accepting money for surgery, but encompass as well the circumstances and duties surrounding the taking of the money. To focus, as respondent would, only on the isolated act of taking money for surgery would take the act out of context. In reviewing the charge sheet offered by a foreign state, it would seem that this court should exercise a common sense reading of what the indictment contains. The court is not obligated to don the blinders respondent offers.

Once the focus turns to whether payments were received by respondent to affect his duty of exercising discretion (as a surgeon, department head, and/or public servant) in electing whether or not to personally perform surgery, it is not difficult to see this for the straightforward bribery issue that it is. The question of whether it was strictly commercial bribery, in the sense that only private individuals were involved and private duties owed, or there was some governmental nexus because the employing institution received some governmental funding and/or is subject to some governmental regulation, see, e.g., 18 U.S.C. § 666 (making it a crime for an employee of an organization receiving yearly federal assistance in excess of $10,000 to accept a bribe); 42 U.S.C. § 1320a–7b (making it a crime for anyone to accept bribe for arranging or ordering services paid for by Medicare), is not critical to a dual criminality determination since the alleged acts could have been prosecuted in this country under either theory.

## II. RECEIPT OF SOMETHING BY DECEIT

 It is a violation of the law in Israel for a person to obtain property, including

---

1. Interestingly, respondent states that "even if, *arguendo,* a private person can be "bribed," he is deemed "bribed" only if he is paid for *discretionary* acts or judgments that he makes." Respondent's Supplemental Memorandum, April

10, 1991, at 16. This is precisely the factual issue in the case: whether Dr. Heilbronn, who testified he was totally in charge of the neurosurgery department, received outside payment for making discretionary decisions to operate.

money, by deceit. Deceit is defined as including any oral or factual assertion, or assertion made by conduct, which a person makes knowing it to be untrue or which the person does not believe to be true. To "deceive" means to induce a person by deceit to do or refrain from doing any act. If the fraud is accompanied by aggravating circumstances (e.g. amount of money involved, vulnerability of the victims, etc.) there is a penalty enhancement.

This offense clearly comes within the offense listed in the Convention, and in this country would constitute fraud or obtaining money or property by false pretenses. See, e.g. 18 U.S.C. §§ 1341, 1343.

EIGHTH, that there is probable cause to believe that respondent committed the offenses of bribery as alleged in charges 1–10, but not as alleged in charge 12.

■ The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial. *Collins v. Loisel,* *supra.* Each allegation of bribery will be considered separately.

## I. Charge One.

The first charge involves an allegation that the respondent solicited a bribe to perform an operation on Ms. Yaffa Ben–Moshe. An affidavit submitted by the patient's brother, Shmuel Ben–Moshe, establishes that the patient was admitted to the neurosurgery department at the Beilinson Hospital. Following a CT scan of her head, it was determined that her medical condition necessitated an operation. Ms. Ben–Moshe spent several months in the hospital and her brother met with the accused frequently to discuss her medical condition.

In the fall of 1986, respondent advised the brother that the operation would be performed shortly, without stating the name of the doctor who would perform the operation.

The brother felt that the respondent, as the director of the department, would be the best doctor to perform the operation. The brother stated that it was "an open secret in the Neuro–Surgery Department among the families of the patients that one could pay Dr. Heilbronn and have him perform the operation himself." With this in mind, the brother asked the respondent to perform the operation. The accused intimated to the brother that if he were interested in having him personally perform the operation, a special payment to him would be required along with a donation to the fund.

Shortly before the operation, the respondent called the brother into a room at the hospital for a talk. During the talk, the brother asked the respondent "How much I would have to pay, and Dr. Heilbronn signified to me with his fingers the number 3." The brother asked what 3 meant and Dr. Heilbronn answered $3,000.

The brother told the respondent that the amount was high "and that I did not think he should extract such amounts, if at all. I also mentioned to him that this was not his private clinic nor even the hospital private medical service."

Finally, it was agreed that the brother should pay $1,000 in cash and make a further contribution of NIS 750 to the department's fund. For the NIS 750 he was given a receipt.

After the operation, respondent told the brother to go to respondent's room. Dr. Heilbronn closed the door and the brother paid him $1,000 which respondent immediately placed in his pocket. The brother states, "For this, of course, I was given no receipt."

Although the respondent told the brother after the operation that the small blood clot involved had been entirely removed, and that another operation was definitely not needed, two more operations eventually had to be performed by the respondent and the patient ended up as a "vegetable." It is not alleged, however, that respondent required any further payment for the two additional operations.

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his

discretion as the director of his department.

## II. Charge Two.

The second charge relates to a Ms. Sara Ox who was admitted into the Neuro–Surgery Department at the Beilinson Hospital in June 1986 with a suspected head tumor. This charge is supported by an affidavit filed by the son of Sara Ox.

In his affidavit, the son states that he learned from families of patients who were in the department at that time that the best surgeon was Dr. Heilbronn and that for Dr. Heilbronn to operate, money had to be paid.

The affidavit further states that the son and his father met Dr. Heilbronn and asked him to operate on Ms. Ox because they believed him to be the best surgeon in the department. Dr. Heilbronn, according to the affidavit, spread his two hands and said, "These hands cost $5,000." The father stated to Dr. Heilbronn that he was retired and could not pay this amount. Dr. Heilbronn stated "If you don't have the money, let your son pay." Dr. Heilbronn apparently further stated that if the son did not pay, another surgeon would undertake the operation. When Dr. Heilbronn stated that he did not know whether such a surgeon would be a new surgeon or a veteran, the son and father agreed to pay $3,000 to Dr. Heilbronn after the operation.

At the same meeting, respondent also asked that 500 Sheqels be donated to the department's fund. The respondent stated that the money should be brought to him immediately after the operation. The respondent insisted that the payment be only in dollars.

The operation was performed in July 1986. Immediately after the operation, respondent called the affiant and his father into his room, closed the door and "put out his hand like a beggar and that was his sign to make the payment." The son states:

"The money was in nylon bags with rubberbands around the money. I gave the money to Dr. Heilbronn. In our presence, Dr. Heilbronn counted the money and after he had seen that there were indeed 3,000 Dollars he put the money into his pocket. At the time when I gave him the money and also in the previous conversations in which the payment had been agreed, Dr. Heilbronn had told us not to speak about the subject of the money with anyone."

No receipt was given.

Two months later, the mother died.

The affiant concludes by noting that his mother was admitted to the Beilinson Hospital as a member of the Histadrut Sick Fund and that she never visited Dr. Heilbronn in a private capacity.

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his discretion as the director of his department.

## III. Charge Three.

The third charge pertains to an 18–year old boy named Ronen Dagdeni, who was a member of the Histadrut Sick Fund.

According to the affidavit of Ronen's mother, on June 15, 1987, she took him to the Neuro–Surgical Department at the Beilinson Hospital where he was examined. Dr. Heilbronn then met with the mother and told her that her son needed an urgent operation within a week. When the mother and her husband asked Dr. Heilbronn to do the operation himself, Dr. Heilbronn indicated that the staff would normally perform the operation but that if he were to do it, it would cost money.

The mother then offered Dr. Heilbronn $500, with another $500 for the department's Sick Fund. Dr. Heilbronn, according to the mother's affidavit, countered by stating that he wanted $1,000 with an additional $500 for the department's fund. According to her affidavit, the mother and her husband paid Dr. Heilbronn $1,000 two days after the operation. The three of them went into his room where Dr. Heilbronn locked the door and asked that the matter remain a secret between the three of them. A month later, the mother and

her husband contributed the promised money to the departmental fund.

The mother subsequently filed a complaint against Dr. Heilbronn to the Sick Fund Comptroller. She testifies in her affidavit that when Dr. Heilbronn found out about it he pressured her to write a letter retracting her complaint. She stated "I was afraid that my son would not obtain further treatment in the department of which Dr. Heilbronn was the director, and the only thing I saw was the good of my son, and what is written in that letter is incorrect."

Wagdeni Ziva concludes in her affidavit by noting that she and her family were never Dr. Heilbronn's private patients, and that she received no receipt for the thousand dollars which she gave to him.

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his discretion as the director of his department.

## IV. Fourth Charge.

The fourth complaint pertains to a patient named Waacov Harel. This charge is supported by affidavits filed by the patient's widow, Sarah Harel and his sister, Ora Shorek, a nurse. All members of this family were members of the Histadrut Sick Fund.

According to the widow's affidavit, the patient's illness was diagnosed in 1984 at the Beilinson Hospital and an operation was performed by a Dr. Toledo. The patient recovered and functioned well for two years.

In November, 1986 the patient was again admitted to the hospital where the plaintiff came under the care of Dr. Heilbronn.

According to the affidavit of the plaintiff's sister, Dr. Heilbronn told the family that it was urgent he have an operation. Dr. Heilbronn told the sister that he wanted to speak with her. The conversation was held in Dr. Heilbronn's room, after other doctors in the room had left. Dr. Heilbronn then locked the door. The sister asked Dr. Heilbronn to perform the operation since it was a serious one involving the head. Dr. Heilbronn told the sister that the family would have to pay him $2,000 and make an additional donation to the Fund. No date was agreed upon for the payment but just the amount. Dr. Heilbronn asked that the family bring him the money as soon as possible.

Five days after this conversation, Dr. Heilbronn operated on Waacov Harel. According to the affidavits of the two sisters-in-law, a week went by between the operation and the time the payment was made. During this time, Dr. Heilbronn continued to pressure the family to make the payment, once physically pushing the wife into a corner of the corridor and demanding his money. The money was paid to Dr. Heilbronn by the sister. When he accepted the money he placed it in a drawer and locked it, and asked the sister not to tell anyone that she had given money to him. When her husband learned that she and her sister were paying Dr. Heilbronn he said this was unacceptable to him since he was a member of the Sick Fund and Dr. Heilbronn was not a private surgeon but operated under the aegis of the department. The payment was nevertheless made, not without some difficulty to the family.

Several days later, the patient's head became inflamed where the stitches were located and Dr. Heilbronn admitted that the stitches used to close the head wound were not the proper ones for a person who had radiation treatment. Within a matter of weeks, the patient died.

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his discretion as the director of his department.

## V. Fifth Charge.

The fifth charge pertains to Aharon Sharfi, a member of the General Sick Fund who was transferred to the Neuro–Surgical Department at the Beilinson Hospital after suffering a brain hemorrhage. The patient's brother, Sharfi Yosef, has filed an

affidavit stating that Dr. Heilbronn explained to him that an operation needed to be performed on his brother. Dr. Heilbronn, of his own initiative, told the brother that he, Dr. Heilbronn, "did not have to operate on my brother" and that if the affiant wanted Dr. Heilbronn to operate, "the first thing I had to do was make a donation to the department."

Dr. Heilbronn then asked how many brothers there were in the family and what they did for a living. Dr. Heilbronn then said "he would not take a large amount and asked me for an amount of $2,000." Dr. Heilbronn said that he preferred the payment to be "in greenbacks."

The money was paid a day or two before the operation. Dr. Heilbronn did not provide a receipt, but put the money "in his pocket or a drawer" and said that he would perform the operation, which he did.

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his discretion as the director of his department.

## VI. Sixth Charge.

Charge number six pertains to Gilad Yoram, who was admitted to the Neuro–Surgical Department at Beilinson Hospital in July, 1987.

According to an affidavit submitted by the patient's brother, the patient had twice undergone operations at another hospital for cancer in the neck. After the patient's transfer to Beilinson Hospital, Dr. Heilbronn explained that a head operation should be performed immediately, and that since it was very complicated, a specialist should perform it. Dr. Heilbronn told the brother that the condition of the patient was "very difficult and could result in sudden death."

The brother then asked Dr. Heilbronn if he would perform the operation. Dr. Heilbronn agreed to perform the operation if he were paid $3,000 and if, in addition, a donation was made to the Department's Fund. Because of the seriousness of the patient's condition, the brother in his affidavit states that the family was "left with no choice but to agree to Dr. Heilbronn's demand and pay him an amount equivalent to $3,000 so that he would operate on my brother as soon as possible.... I should like to add that until I spoke with Dr. Heilbronn for him to operate on my brother, and we agreed on a payment of an amount equivalent to $3,000, no date was fixed for the operation. After we agreed, the following day or the day after a date for the operation was fixed." The brother agreed to pay half the amount before the operation and the other half after the operation.

A date was fixed for the operation the following day. Several days before the operation the brother went to Dr. Heilbronn's room. Dr. Heilbronn closed the door and the brother paid him one-half the money.

The operation, according to the affidavit, was performed on July 20, 1987 and was successful. Several days later the brother went to Dr. Heilbronn's office. Dr. Heilbronn again closed the door and the brother paid him the remaining money, also in cash.

The brother also paid an amount into the Department's Fund. This amount was paid to the secretary, by check. The brother received no receipt from Dr. Heilbronn but was given a receipt for the money paid to the Fund.

The patient was a member of the General Sick Fund and was never treated privately by Dr. Heilbronn.

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his discretion as the director of his department.

## VII. Charge Seven.

Charge number seven pertains to Marcus Matskin and is supported by an affidavit from his son, Sergio Matskin.

According to the affidavit, the patient was hospitalized at the Beilinson Hospital in September 1986, after his son and mem-

bers of his family noticed that the father's jaw was swollen. After the patient underwent tests in the neurology department, it was concluded that he needed an operation on his head. He was transferred to the Neuro–Surgical Department which was directed by Dr. Heilbronn.

Due to the seriousness of the patient's condition, his daughter, who lives in Argentina, also came to Israel.

Prior to their father's operation, and before a final date had been fixed, the son and daughter approached Dr. Heilbronn because they assumed since he was the director of the department that he was the best surgeon. During the discussions it "came out that he was asking for $2,000 for him, Dr. Heilbronn, to operate on my father." The daughter paid most of the money and the balance was paid by the son several days later. The talks with Dr. Heilbronn concerning the payment of money took place in his room approximately two weeks before the operation.

It subsequently developed that there were further growths throughout the 76–year old patient's body, and there was no point to further operations. The father returned to his home and died in May 1987.

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his discretion as the director of his department.

VIII. Eighth Charge.

The eighth charge pertains to Karkukli Yaacov and is supported by an affidavits filed by his wife.

Karkukli Yaacov was initially hospitalized in 1982 for an operation by the respondent, and it became apparent in 1987 that a second operation would be necessary.

Solely because Dr. Heilbronn had performed the first operation, the patient was taken to Beilinson Hospital where Dr. Heilbronn had been appointed in the intervening time as Director of the Neuro–Surgical Department. When the wife personally asked Dr. Heilbronn to operate on her husband, Dr. Heilbronn gave "his explicit word that he would be the one to operate on my husband." In return for his agreeing to be the surgeon, he asked that the family purchase a photocopier for the department. "He took out of his pocket a prospectus and gave it to us so that we could purchase it." The agreement to purchase the photocopier was strictly in return for Dr. Heilbronn's promise to personally perform the operation.

Several days after the operation, the wife met Dr. Heilbronn in the corridor and "he told me that he knew that the photocopier that we had donated to the department had cost less than $2,000, which was the amount that I had undertaken to pay as a donation to the department for Dr. Heilbronn to operate on my husband." The plaintiff's wife then made an additional payment to the department, "since Dr. Heilbronn had asked for the difference and I did not want to annoy him."

Based upon the evidence of record, I find probable cause to believe that respondent solicited and received a payment of money to corruptly influence the exercise of his discretion as the director of his department.

IX. Charge Nine.

The ninth charge pertains to Ehud Degan, a 15–year old boy who was admitted to the Neuro–Surgical Department at the Beilinson Hospital for intensive treatment. This took place around September, 1986.

According to the father's affidavit, Dr. Heilbronn told them there was no choice and their son had to have an operation. Dr. Heilbronn said that he was going on vacation and that his deputy would look after the matter.

The parents, however, pleaded with respondent to operate since they wanted the best surgeon to operate on their boy. Dr. Heilbronn consented and said that he would postpone his vacation and would cancel a lecture he was suppose to give and would operate on the son if the parents would donate $500 to the department and, since he would be incurring a loss because of the cancellation of the lecture and post-

ponement of the annual vacation, he wanted he wanted an additional $1,500 for himself. The operation took place that evening.

The following day the son's father paid Dr. Heilbronn the money agreed upon and Dr. Heilbronn put the money in his wallet. He added that the whole matter should remain just between him and the family. The parents received no receipt.

The father also gave a check to the secretary for the department's fund the same day, for which he received receipt.

If the only payment of money in this instance was the $1,500 paid directly to Dr. Heilbronn, it would be difficult to find that probable cause had been established for the solicitation and/or acceptance of a bribe. Unlike other charges in this proceeding, in this instance the supporting affidavit of the parents states that Dr. Heilbronn wanted $1,500 "since he would be incurring a loss because of cancellation of the lecture and postponement of the annual vacation." Coupled with the fact that, according to the affidavit, the respondent had previously stated that he was going on vacation, that his deputy would look after the matter, and that it was the parents who "pleaded with him, with Dr. Heilbronn and asked him nevertheless to operate," I must conclude from the evidence that the money was paid in essence as a reimbursement to the respondent. This payment amounts to nothing more than a *quid pro quo* for the doctor's losses.

On the other hand, there is evidence that respondent's decision to elect to operate himself rested at least in part on the parents' agreement to donate $500 to the departmental fund. This payment, unlike the payment directly to Dr. Heilbronn, was not posited as, and cannot be seen as, a *quid pro quo* for any losses Dr. Heilbronn suffered in cancelling his lecture or putting off his vacation.

It has also been alleged that Dr. Heilbronn moved this surgery ahead of other cases. It appears that the scheduling of the operation, however, was solely to accommodate Dr. Heilbronn's schedule, since he was delaying his vacation, and not something specifically sought by the parents. In making the payments to Dr. Heilbronn and the department, the parents simply sought to insure that Dr. Heilbronn would personally perform the operation. I do not find evidence that Dr. Heilbronn accepted a bribe for the purpose of moving the surgery ahead on the schedule. I do find, however, probable cause to believe that respondent accepted a bribe in the form of a contribution to his departmental fund in exchange for exercising his discretion to agree to perform the operation rather than to assign the matter to his deputy.

## X. Charge Ten.

Charge Ten refers to Zeglig Migdal, a member of the Histadrut Sick Fund, who was admitted to the Neuro–Surgical Department of the Beilinson Hospital at the beginning of 1986.

In affidavits filed by the patient and his son-in-law, it states that he stayed in the department for approximately a month, during which time a series of tests and x-rays were completed.

The family had previously been told by the deputy director of another neuro-surgical department that the patient's operation was urgent since the disease caused irreversible damage. The patient was alternately told at Beilinson that he was about to undergo an operation, or that his operation had been postponed.

Finally, Dr. Heilbronn, with whom the patient had had no previous contact, told him that he was being sent home and that he would be called when there was room for him in the department. The patient states that his condition was bad and that he was unable to move. The patient's son-in-law, who was also a doctor, immediately talked to Dr. Heilbronn.

Dr. Heilbronn explained to the son-in-law that there had been an improvement in the condition of his father-in-law and that it had thus been decided to postpone the operation. The son-in-law states:

"I told Dr. Heilbronn in that moment when we were alone together in the room that I was interested in giving a donation

to the Department. I suggested this since I was sure that this was the reason that people in a better condition were going to be operated on before my father-in-law. The moment I spoke to him about the donation, he said that he had noticed that day in the morning that there had been some deterioration in my father-in-law's condition."

The son-in-law first indicated he was interested in donating $500. Dr. Heilbronn explained that the department had no money and that this money would go to buy a computer for the department. The evidence shows that this payment assured the father-in-law of an operation.

Who would perform the operation was another question. The son-in-law continues in his affidavit:

"At the end of the conversation, when I got up and we shook hands, Dr. Heilbronn said: 'By the way, our doctors are excellent, but if you are interested in having me operate, it will cost you $1,000.' "

The son-in-law also states:

"And that is how it was. My father-in-law was operated on 2–3 days after my conversation with Dr. Heilbronn and my donation to the Fund of $1,000."

Thus, the additional payment secured Dr. Heilbronn's personal services.

Finally, the son-in-law offers further evidence of the context in which these payments were made. He points out that there were three other people in the room with his father-in-law, two of whom made payments and were operated on immediately, "and one who explicitly did not agree to pay. His operation was put off for a number of months."

The patient in his affidavit adds:

"I was in the room with other patients. I should like to note that the 'topic of the day' in our conversations was how much money each had been required to pay to Dr. Heilbronn for performance of the operation.' "

The patient states in his affidavit that the conversation in which Dr. Heilbronn told him he would be going home occurred on a Friday at 11:00 a.m. He subsequently states: "After the amount of money had been agreed, Dr. Heilbronn consented to fix a date for me for the operation for Monday, and he agreed that it should be he who would operate."

I find from this evidence that there is probable cause to believe that respondent solicited and accepted a bribe in exchange for exercising his discretion as the director of the department to schedule an operation for this patient rather than sending him home from the hospital without the operation, and for deciding to perform the operation personally.

## XI. Charge 12.

■ Charge number 12 pertains to Haim Freidman who was hospitalized at the Beilinson Hospital in February or March 1987 in the Internal Medicine Department.

According to an affidavit submitted by Motti Friedman, the affiant's father remained in the Internal Medicine Department for two weeks. A fist-size growth was diagnosed in the patient's head and he was transferred to the Neuro–Surgical Department for an operation.

Affiant, and possibly the patient's wife, met with Dr. Heilbronn who recommended an operation within the week. The affiant states that "It is reasonable to assume that we asked Dr. Heilbronn to perform the operation on my father." Affiant further states that "I assumed that after Dr. Heilbronn already knew me and knew with whom I was in touch, that he would operate on my father. I assume that Dr. Heilbronn operated on my father."

The operation took place after about one week. The affiant states that Dr. Heilbronn "used to come into my father's room frequently and gave Daddy to understand that he was important for Dr. Heilbronn. My parents assume that Dr. Heilbronn saved my father's life."

Affiant then states that a few weeks *after* the operation and shortly before the patient's discharge,

"we decided to contribute to the department's fund and also give a nice present

to Dr. Heilbronn. To the best of my recollection, we donated $500 to the department's fund and gave a present to the secretary. We paid by check and to the best of my recollection were given a receipt. In addition, I gave to Dr. Heilbronn myself an amount of NIS 500 or NIS 1,000 in cash. I gave him the money in his room. Dr. Heilbronn closed the door. Dr. Heilbronn did not object to receiving money but was fearful and asked me not to tell anyone else about it. I am a member of the Maccabi Sick Fund."

The evidence in this instance shows at most that the department accepted a gratuity after the fact, which apparently is entirely proper, and that Dr. Heilbronn also accepted a separate gratuity after the fact. Whether or not it was appropriate for Dr. Heilbronn to personally accept a gratuity after the operation, there is no suggestion in this affidavit that Dr. Heilbronn at any time solicited or accepted this cash payment in return for corruptly exercising his discretion to operate on the patient. There is no evidence he even expected to receive a cash payment. Bribery, as previously stated, does not apply to the mere taking of a reward. Whatever the motives may have been for Dr. Heilbronn to operate personally, or for the family to decide to pay him afterwards, the evidence does not support an allegation that respondent solicited or accepted the payment as a bribe. Accordingly, I do not find probable cause to believe there was a bribe in this instance.

NINTH, that there is probable cause to believe that respondent committed the offense of receipt of something by deceit as alleged in charge number eight, but not as alleged in charge number nine.[2]

 In two instances, charge eight, the Karkukli case, and in charge nine, the Degan case, respondent is charged with defrauding the families by falsely promising to personally perform each surgery, and by falsely indicating to each family

after the surgery that he had indeed performed it, when in fact he did not do so. It is alleged in the charge sheet that in each instance the operation was performed by Dr. Einan, not the respondent, and that in each instance the respondent asked Dr. Einan to record in the medical records that the respondent had performed the operation. In the Karkukli case, it is further alleged that the respondent asked Dr. Einan to tell the patient's family that the respondent had performed the operation rather than Dr. Einan.

In both cases, affidavits of family members establish that Dr. Heilbronn promised to perform the operation and that he represented after the operations that he had done so, and that based upon these representations the payments sought by Dr. Heilbronn were made by the family members as promised.

Further, in each case the court is directed to the affidavits of Dr. Einan for proof that Dr. Heilbronn did not, in fact, perform the operations.

In the Karkukli case, the evidence is straight-forward. In a corrected affidavit filed June 17, 1988, Dr. Einan states that in the medical records for that operation he appears as the surgeon and Dr. Povzner as the assistant surgeon. Dr. Einan then states: "Dr. Heilbronn did not physically take part in the operation at all."

Pursuant to *Collins v. Loisel, supra*, 259 U.S. at 315–317, 42 S.Ct. at 471–72, Dr. Heilbronn was allowed to testify and introduce evidence bearing on the issue of probable cause, to the extent that it clarified ambiguities or otherwise explained the various hospital procedures. It was fully understood, as respondent's counsel acknowledged at the beginning of the testimony, transcript of March 27, 1991 hearing at 84, that Dr. Heilbronn's testimony was not being presented to contradict any of the evidence presented on behalf of the State of Israel.

---

**2.** The standard by which the committing magistrate is to determine whether there is adequate evidence to justify holding the accused for trial is the same in regard to these two charges as for

the charges of bribery previously discussed in finding number eight. See *Collins v. Loisel, supra.*

The essence of Dr. Heilbronn's testimony was that as the Director of the Neuro–Surgery Department in a teaching hospital, he frequently observed and participated in the operations that took place in his department, either by means of video facilities or in person. He would frequently stand at the elbow of the surgeon performing the operation to guide him, counsel him, perform a portion of the procedure, or if need be intervene and take over the procedure entirely. The court finds this procedure to be not inconsistent with the practices of teaching hospitals in this country. And where it is acknowledged that two surgeons both physically take part in an operation in the manner described, there may be a legitimate issue over who performed the operation.

But where, as in the Karkukli case, there is a doctor's affidavit offered by the requesting State which explicitly states that respondent "did not physically take part in the operation at all", it would be improper to determine that probable cause did not exist solely because respondent testified that he did physically participate in the operation. The respondent's testimony would be in direct contradiction to the affidavit submitted by the requesting State, and if this testimony were allowed in for this purpose, the only way it could be defeated by the requesting State would be for that State to furnish live witnesses and in effect try their case in this court. Clearly, they are not required to do that under extradition law.

Consequently, in the face of the unequivocal testimony of Dr. Einan that Dr. Heilbronn did not physically participate in the Karkukli operation, the court cannot accept Dr. Heilbronn's testimony on this point to the contrary. Whether or not one or both doctors has forgotten or has misrepresented, intentionally or otherwise, what took place during that operation is a question of fact to be resolved by the Israeli courts. Based upon the representations of Dr. Heilbronn to the Karkukli family that he would, and did, personally perform the operation, for which he then received payment, and the affidavit of Dr. Einan that respondent did not perform the operation

at all, there is competent and sufficient evidence to support a finding of probable cause to believe that Dr. Heilbronn received something by deceit.

It is a different situation, however, in charge number nine pertaining to Ehud Degan. In this case it is acknowledged even in the charge sheet that respondent "served as assistant surgeon for that operation." While Dr. Einan states that "Dr. Heilbronn did not operate on Mr. Degan," Dr. Einan also states that Dr. Heilbronn is listed in the medical records as the assistant surgeon. Dr. Einan Affidavit of June 17, 1988. Dr. Einan also states in his June 14, 1988 affidavit that, "[i]t should be noted that if it is recorded that Dr. Heilbronn assisted with the operation, then he indeed did so, ..."

Both of these statements are consistent with the facts found from the affidavit of the patient's father. The affidavit establishes that respondent cancelled his lecture and postponed his vacation in order to be available for the operation, that respondent was seen entering the operating theatre, that he remained inside for about "3 or 2 hours", and exited shortly before Dr. Einan.

Dr. Heilbronn testified:

"... in this particular case, this was a small brain abscess with a capsule that had to be removed. You can argue until Hell freezes over who is contributing more to the success of such a particular operation, the person removing the incapsulated pus pocket or the person who retracts with his hands very gently the normal brain tissue around that abscess so that this abscess can be removed with as little trauma to the normal brain as possible. Your witness is the one that held the retractors and enabled his junior deputy to remove that abscess and push the abscess out so that he can more easily take it out, which was really the essence of the surgery to remove the sick tissue with as little or no damage to normal tissue. It's the way I was taught, that the way I was teaching my more junior people, and opening the

skull, opening the membrane covering the brain and finding the abscess was not difficult. It was all there. It was all visible on the x-ray films, and it was fairly routine. And I was there. I was there physically. I scrubbed. I did a crucial help of the assisting. . . ." March 27 transcript at 102.

I do not find this testimony to be in any way inconsistent with the testimony of either Dr. Einan or the patient's father.

While it is true that Dr. Einan states that "there is a difference" between who performs an operation and who assists, and that Dr. Heilbronn did not perform this operation, Dr. Einan also adds the following:

"When talking about who took part in the operation, the meaning is that he operates on the patient and the role of the assistant surgeon is to assist the surgeon in various actions, that, together with the surgeon, comprise the operation." Dr. Einan Affidavit of June 17, 1988.

Although Dr. Einan would acknowledge only one doctor as being the "surgeon" in an operation, it is necessary to pierce the labels and look at the facts. Dr. Einan acknowledges that the surgeon and his assistant worked together as a team. The facts further show that the assistant was actually the senior doctor, that the senior doctor minimized trauma to the brain, facilitated Dr. Einan in removing the pus pocket, and was immediately available to do even that aspect of the operation if necessary. Regardless of the medical protocol, the question is: "who may be said to have "operated" on the patient?," as that term would have presumably been understood by the patient's family.

Top surgeons frequently do not perform every aspect of an operation. If, for example, a top surgeon did not open or close the patient but only performed the difficult aspects of surgery occurring in the middle of an operation, would anyone reasonably argue that the surgeon had not "operated" on the patient?

In this case, the evidence supports a finding that both doctors can be said to have done so. Dr. Heilbronn postponed his vacation and spent several hours in the operating room actively participating in the surgery. This is what the boy's parents bargained for. The testimony showed that Dr. Heilbronn had the authority to intervene and take over an operation anytime he was present if he felt the need to do so. In light of that, and the fact that he actively participated, if only as an assistant, I cannot find probable cause to believe that he defrauded the patient and his family in this instance.

*Conclusion*

For the preceding reasons, I find that there is probable cause to believe that Yechiel Heilbronn committed the offenses of bribery in charges 1–10 and the offense of receipt of something by deceit in charge number eight, and that he has no valid defense to extradition to Israel. Accordingly, it is,

ORDERED that this Certificate of Extraditability and Order of Commitment together with all formal extradition documents received in evidence, together with a certified copy of all testimony and evidence taken at hearings and all briefs filed on the issue of extradition, and orders filed by the court, be forwarded to the Secretary of State by the Clerk of this Court so that a warrant may issue upon the requisition of the proper authorities of the State of Israel for the surrender of the said Yechiel Heilbronn; and it is further

ORDERED that the said Yechiel Heilbronn be, and he hereby is, committed to the custody of the United States Marshal pending surrender of Yechiel Heilbronn to Israeli authorities, or until further order of this court.